**UNITED STATED DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Case No. 00-2611 JRT/SRN

Patricia Johnson and Karla Kullman,

Plaintiffs,

v.

City of Glencoe, Minnesota; City of Glencoe, Minnesota Police Department; Chief of Police Wes Olson, in his official and individual capacities; City Administrator Mark Larson, in his official and individual capacities; and George Scheidt, in his official and individual capacities,

Defendants.

**STIPULATION AND ORDER FOR**

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

WHEREAS, after the commencement of this action, Karla Kullman has been added as a Plaintiff and her claims encompass George Scheidt as a defendant (in his official and individual capacities); and

WHEREAS, the parties have agreed that adding these two parties to this action promotes judicial economy and have stipulated to the additions;

NOW THEREFORE, the parties stipulate to the attached First Amended Complaint and it is hereby served and filed.

**So stipulated:**

Dated: 7/3/01

**ATTORNEYS FOR PLAINTIFFS**

Jill Clark (#196988), Jill Clark, P.A.
2005 Aquila Avenue North
Golden Valley, MN 55427
Phone: 763 417-9102

FILED JUL 31 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

**So stipulated:**

Dated: July 18, 2001

**ATTORNEYS FOR DEFENDANTS**

Julie Fleming-Wolfe (175377)
Attorney at Law
1010 Degree of Honor Building
325 Cedar Street
St. Paul, MN 55101
PH: 651/767-8642

***

**IT IS SO ORDERED**:

Susan Richard Nelson
SUSAN R. NELSON
UNITED STATES MAGISTRATE JUDGE

July 31, 2001
Dated

**UNITED STATED DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Case No. 00-2611

Patricia Johnson and Karla Kullman,

Plaintiffs,

v.

City of Glencoe, Minnesota; City of Glencoe, Minnesota Police Department; Chief of Police Wes Olson, in his official and individual capacities; City Administrator Mark Larson, in his official and individual capacities; and George Scheidt, in his official and individual capacities,

Defendants.

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Patricia Johnson and Karla Kullman, for their Complaint against Defendants, and each of them, states and alleges as follows:

**PARTIES**

1. Plaintiff Patricia Johnson ("Johnson") is a citizen of McLeod County, and a former employee of the City of Glencoe, Minnesota, Police Department.

1.5 Plaintiff Karla Kullman ("Kullman") is a citizen of McLeod County, and the current Finance Director for the City of Glencoe. "Plaintiffs" refers jointly to both Plaintiffs in this action.

2. Defendant City of Glencoe, Minnesota ("Glencoe" or "City"), upon information and belief is an incorporated city in Minnesota.

3. Defendant Wes Olson ("Olson"), at all material times, was the Police Chief

("Chief") of Glencoe, at times was the owner of a private business selling uniforms, and an individual. Olson acted both within and without his duties as Chief.

3.5 Defendant George Scheidt ("Scheidt") was at materials times a member of the Glencoe City Council, and in an individual resident of McLeod County. Scheidt acted both within and without his role as City Councilperson.

4. Defendant Mark Larson ("Larson"), at all material times, was the City Administrator, and an individual. Larson acted both within and without his duties as such.

5. Olson and Larson and Scheidt collectively and/or individually either participated in or were in a position to prevent another from performing the wrongs set forth below, including unconstitutional acts, were aware of those wrongs and failed to properly supervise, train or control subordinates or others, and were deliberately indifferent to the rights of Plaintiffs. Their conduct violated clearly established constitutional and other rights of which a reasonable person would have known, including but not limited to the right of public employees to voice their opinions under the First Amendment, and to complain about the misuse of public funds, without retribution. No reasonable person could have believed, under the circumstances set forth below, that the actions of Olson and/or Larson and/or Scheidt (or others) were lawful.

**JURISDICTION AND VENUE**

6. At all relevant times, City has been an "employer" and Plaintiffs have been "employees" and/or private citizens/taxpayers. Plaintiffs were not required to exhaust any administrative remedies, and/or exhausted all administrative remedies.

7. Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over this matter, which arises in part under the laws of the United States (including 42 U.S.C. §1983). This Court has the authority to take jurisdiction over all other claims, under the doctrine of pendant jurisdiction.

8. Pursuant to 28 U.S.C. §1391(b)(2) and (3), this Court is the proper venue for this

action, because (1) the defendants reside here; (2) substantial events or omissions giving rise to the claims occurred here; and (3) this is the jurisdiction in which the defendant can be found.

**FACTUAL ALLEGATIONS with an emphasis on Johnson's Claims**

9. Johnson was hired in May 1995 by former Chief Larry Aldape and served as a part-time secretary in the Glencoe Police Department. She did her job well; her performance was not criticized, even upon her termination.

10. At the time of Johnson's hire, Olson was serving as a Lieutenant in the Glencoe Police Department. He was part owner of a uniform store in Glencoe (Glencoe Uniform Shop ("GU")), which sold, among other things, police uniforms and paraphernalia. In 1998 Olson was promoted to Chief. Another qualified candidate from Iowa was passed over for the position.

11. During the period the City was advertising the Chief position, Johnson told the City Administrator that she did not believe that Olson was the most qualified candidate for the position. Johnson later learned that the City Administrator and Olson were close friends.

12. Once in the Chief position, the City Council told Olson that he was not allowed to select GU as the provider of uniforms (and related paraphernalia) to the City. The City Administrator, Mark Larson, issued a memorandum to All Police Department Employees/Finance Department dated June 15, 1998, stating in pertinent part:

> As of June 16, 1998, the City of Glencoe will no longer contract with Glencoe Uniforms for purchase of law enforcement supplies and equipment.

Upon information and belief, such transactions are prohibited by the City Charter.

13. Olson promoted Jim Raiter ("Raiter") (the co-owner of GU) to Lieutenant. Raiter later sold his interest in GU to Lance Hallett ("Hallett"). Upon information and belief, while performing due diligence and/or learning the details of the business GU, Hallett became suspicious of improprieties in the running of the uniform business, including illegal acts

involving GU and the City. These improprieties/illegal and/or suspected illegal acts related to the uniform business included:

- inventory on shelves of GU did not match records of inventory; and
- GU received $1,700 from the City of Glencoe for merchandise which the City never received.

14. Hallett's letter to Olson fell into the hands of then City employee Scott Stumpf ("Stumpf"), who became concerned about the illegal conduct it addressed. Either through Hallett or Stumpf (or both), Johnson and Kullman learned about financial improprieties involving GU.

15. Stumpf, Johnson and Kullman then learned additional facts regarding Olson's and/or GU' dealings with the City. For example, it was learned that GU sold uniform product to a business in Milwaukee, Wisconsin, which turned around and sold the exact same products to the City of Glencoe Police Department (with invoices that match exactly the description of the product and the dollar amount). No one had been "checking in" police uniforms and paraphernalia, purchased during Olson's time as Chief (the Glencoe Reserves had previously been doing this, but Olson asked them to stop). The Glencoe Reserves had their own checking account, which Olson persuaded them to turn over to GU. In addition, the uniform "needs" of the Glencoe Police Department had significantly increased since Olson had become Chief, although there were no more officers than in previous years. Also in 1999: 1) Rotary pancake breakfast: Chief Olson had the City pay for his pancake breakfast tickets for his family. Johnson called Randy Wilson ("Wilson"), a City Councilperson to say that she thought this was wrong. Wilson told Johnson, "there are perks that go along with this job..." or words to that effect; 2) holiday season: Johnson had opened a letter from a local businessman, addressed to the Glencoe Police Department, and containing 2 fifty-dollar bills. Johnson took them to the Finance Director. Olson then approached the City Administrator, and told him that those bills were his personal property. The Finance Director entered the bills into the City's ledger. In addition,

another officer who worked at GU was given a free week of City-paid vacation. This same officer who worked at GU was not prosecuted for an assault. Uniform(s) and equipment was purchased in the name of City employees who had never worked for the City. Furthermore, a line of credit was issued to the City to cover purchase of uniforms and paraphernalia; there is no record in the City ledger of certain expenditures from that line of credit.

16. In late 1999, Kullman called the City's private auditor, who told her that she had a duty to bring forward any suspicions about thc misusc of public funds. Kullman approached Johnson, told her that he was reuired to report about the information regarding Olson, and asked if Johnson would accompany her to complain of a violation of law to a member of the City Council. Plaintiff agreed, and on November 9, 1999, Johnson and Kullman met with Councilperson George Scheidt ("Scheidt") and Randy Wilson ("Wilson"); they made a good faith complaint that a violation of law (or suspected violation of law) had occurred. Kullman and Johnson gave the facts and the documentation that had been gathered, including Kullman's notes concerning financial improprieties relating to Larson, to Scheidt and Wilson. The Councilperson promised them that their identities would remain private, and they would not have provided the information but for that promise.

17. Apparently Scheidt and Wilson referred the investigation into the matter to a law firm that receives a meaningful part of its annual compensation directly from the City, including but not limited to referrals of criminal prosecutions directly from the Police Department. Jodi Winters, Esq. ("Winters"), a member of the law firm designated as City Attorney,is involved in prosecuting cases that are referred to her by the Glencoe Police Department.

17.1 On or about November 11, 1999, Wilson called Kullman to tell her that the City Attorney would be investigating, and that he wasn't going to be nice about this whole thing, and that there *better be proof*.

17.2 On or about November 30, 1999 Kullman saw Mark Larson pulling invoices from

GES, to review what the City had paid GES. A former City employee overheard Larson tell Olson, "it's a particular group of people, and I don't know why they are doing this."

17.3 In early December, 1999 then-Mayor Rutske warned Kullman that the City Council viewed her as a "trouble maker." That there would be no discipline this time (even though he thought there should be), but that if "this" continues, Kullman would no longer be here to cause any trouble. Kullman told then-Mayor Rutske what had occurred regarding the LOC at Security Bank. She told the Mayor that there is evidence that the City paid GU for uniforms and/or equipment that it didn't receive. Then-Mayor Rutske told Kullman that the City Attorney did not think there was enough to go forward. He added that the City Council thought Johnson was nothing more than a problem maker. He told Kullman that in the future she was to "work her problems out" with Larson, and not go directly to Councilmembers. He said that the newer Councilmembers in particular thought that Kullman was a troublemaker. Kullman told the then-Mayor that she had been afraid to bring this up, because she was sure that it would be turned against her. The then-Mayor Rutsek also scoffed at the financial improprieties Kullman and Johnson had alleged against Larson.

17.4 That same day, right after then-Mayor Rutske left, Wilson told Kullman that he had urged Rutske to be "firm" with her for making the allegations of financial improprieties. He told Kullman to "put up or shut up," that she should be "on guard," and that she should remember she serves at the pleasure of Rutske. Kullman asked Wilson if she had fewer rights than other tax payers, to question the use of public funds? Wilson said, "it appears that way."

17.5 On December 14, 1999 Kullman complained to the City Attorney's Office that she was the subject of retaliation for complaining about the misuse of public funds. Upon information

and belief the City undertook no investigation into this complaint of First Amendment Retaliation. Rather, the City Attorney's Office told Kullman that it had already concluded that there had been no wrongdoing, and that's what the Council would be told. Kullman replied, "this is truly a sad day for the City of Glencoe."

18. Winters and/or her law firm wrote Plaintiffs letters dated January 20, 2000 regarding "Confidential Investigation," stating in pertinent part:

> I have completed my investigation and have delivered my findings to the City Council. The facts I have gathered show, and the City Council agrees, that there are no improprieties with respect to the financial dealings of the City of Glencoe, primarily focuses upon its police department, and involving city officials. Various items that were brought to the City's attention have been carefully reviewed and determined to be supported by appropriate documentation. In some cases items which may have appeared to be questionable have been adequately explained and documented. The City Council has adopted a resolution indicating that there is no adequate evidence of employee misconduct and has closed the matter.

19. It is unclear what information/documentation was provided to the members of the City Council, but at least one of them said that he had not received any documentation regarding the alleged illegal conduct involving GU.

20. Kullman learned at one point that GU had delivered a "credit memo" to the City, although the Finance Director was not allowed to see it, analyze it, record it, or retain it as documentation for the City's books;

21. At some point during or after the investigation, Plaintiffs'identities were disclosed to the Chief and Larson and to other City Councilmembers.

22. Shortly after the conclusion of the investigation, Olson closed GU, and took down the signs.

23. When Officer Lueth was reinstated to his position within the Glencoe Police Department (an outcome that was avidly opposed by Chief Olson) with back pay, Chief Olson informed Johnson, who responded by saying, "good." 24. Shortly thereafter, Chief Olson recommended to the City Council that Johnson's position be eliminated, allegedly because the back pay owed to Lueth meant that there was not sufficient monies in the budget for Johnson's position. Although it is unclear what information the City Council had (at least one City Council member was unaware of the fact that Johnson held the position that was slated to be eliminated), it approved Olson's request. That City Council meeting was videotaped.

25. By letter dated February 25, 2000, Chief Olson terminated Johnson's employment, stating in pertinent part:

> With the recent arbitration award in Dan Lueths' (sic) favor, the Glencoe Police Department must give Lueth, (sic) back pay of 14 months. This amount is approximately $15,000. The back pay will be distributed from the part-time budget. This is unfortunate but unavoidable. Therefore your position with the Glencoe Police Department has been eliminated.

26. Shortly thereafter, the League of Minnesota Cities, pursuant to its obligations under the insurance pool/trust documents, reimbursed the City for the $15,000 of back pay to Lueth, and same was entered "received" into the City's ledger; and

27. Since Johnson's position was eliminated, the Glencoe Police Department has hired individuals to perform and be paid for the same secretarial work formerly performed by Johnson (some of these duties are being performed at an hourly rate in excess of that paid to Johnson).

28. On or about August 22, 2000, Johnson served a Notice of Claim upon the City Council, c/o the City Administrator. Three days later on August 25, 2000, Larson issued a memorandum to Kullman, her assistant, and a receptionist. Upon information and belief, no

other City employees received this memorandum. It instructed Kullman, who was close personal friends with Johnson, to have "no conversations [with] ... Johnson regarding her employment, dismissal, or pending litigation." The prohibition was not limited to work time. The memorandum stated that Larson (a defendant in the action) was the only one who could approve the release of any information to Johnson. Kullman was the obvious target of this illegal denial of freedom of speech, access to the courts/counsel, and freedom of association. Only later did the City issue a memorandum of this type to all City employees.

28.1 For Kullman, things were quiet for a while. Kullman had been finance director so long that she had institutional knowledge that made it difficult to fire her right away. In addition, as Finance Director, Kullman served as an appointed official. Upon information and belief Rutske and members of the City Council and Larson conspired to keep Kullman from being re-appointed at the beginning of the new Mayoral term.

28.2 Kullman continued to present Larson with information and concerns regarding the use of City monies. She demanded: 1) proper accounting and receipts of the sales at the K-9 trials (although it received unsubstantiated checks and cash); 2) reimbursement for Larson's wife's cell phone (billed to the City) and his personal phone bills. In retaliation, and upon information and belief in furtherance of the plan to keep Kullman from being re-appointed at the end of the Term, Larson started to ease Kullman out of financial processes. For example: 1) for the first time Kullman was not included in budget preparation; 2) she was told not to inventory the pop machines (where she had found a $1,000 error that caused her to question Larson).

28.3 Kullman also continued to warn Larson that the way in which the City was spending money had led to a financial crisis and that it could not pay its bills. Even though

Kullman cannot make money decisions without Larson's approval, the Council blamed Kullman for the bad state of money affairs.

28.4 Defendants alone or in combination, engaged in a conspiratorily-planned series of disciplinary actions designed to violate Kullman's constitutional rights, or in reckless disregard of her constitutional rights. In November 2000 Johnson served a lawsuit against defendants (which was amended to become this First Amended Complaint).

28.5 On or about December 4, 2000 an attorney hired by the City interrogated Kullman, without providing a Tennessen Warning, despite the fact that he elicited private or confidential information relating to Kullman.

28.6 On or about December 18, 2000 then-Mayor Rutske handed Kullman a 2-page written reprimand. He said,

> "I guess the theme that you should come out of this with is that you should know that the City Council members are pretty unhappy. A year ago when you came up with some accusations involving about the City Administrator and Chief of Police, as I talked to you at that time, and I told you, at that time, that if some of the Council members would have their druthers, you wouldn't be here anymore. This supports that theory. It's pretty much 5-1, 5-none I should say that they are totally unhappy. I would suggest that for your own purposes that you modify your behavior to quit annoying the Council Members because they do have recources ultimately. It's just a matter of how far they want to pursue that."

On that same day, the City Council voted unanimously to alter the employee grievance policy to delete the fourth step relating to a grievance committee (consisting of one member chosen by the City Council, one member chosen by the employee, and chosen jointly). Their intention was to give the City Council the final authority on all personnel decisions. Upon information and belief this was designed to get rid of Kullman and allow her no *de facto* appeal procedures, because it gave ultimate authority to the City Council. When discussing the matter (which was broadcast on

cable television), Councilmember Shamla said that after the third step, "and then hire an attorney and sue to beat hell."

28.7 On December 20, 2000 the Personnel/Legislative Committee started a review of Kullman's duties, which upon information and belief was part of an attempt/plan to remove her as Finance Director.

28.8 On or about December 23, 2000 Kullman served a Notice of Claim and grievance on the City, complaining about the misuse of public funds, the illegal treatment noted above in this First Amended Complaint, and her recent reprimand by Rutske. She explicitly stated that she was exercising her First Amendment right to freedom of expression. She noted that the next move under the grievance policy was for the City. The City responded that it did not believe a response was required and never processed the grievance. The City never investigated Kullman's notice that there were additional matters concerning misuse of public funds, and never investigated the illegal treatment against her. It never withdrew the reprimand by Rutske.

28.9 In January 2001 the City Council made known that it did not want to appoint Kullman for another Term. The current Mayor Johnson nonetheless appointed her. This Council meeting was videotaped.

28.10 On or about April 3, 2001, Kullman requested a merit pay increase under the City's policy. Other City officials have received increases under the merit policy, without ado. When Kullman applied, her request was "tabled" by the Personnel/Legislative Committee, and on or about May 2, 2001 Councilmember Scheidt sent a letter to current Mayor Johnson seeking to delay a merit increase for Kullman for at least a year, because allegedly Kullman was not a "team" player; she had been "a participant in the facts/findings and support for Johnson's litigation" (this lawsuit

prior to this First Amended Complaint); she had served the above-mentioned Notice of Claim and grievance; and she had failed over the past "year" to "support" Councilmembers.

28.11 To date, the City has refused to award Kullman a merit pay increase. On the contrary, the City has strayed from its own merit increase policy (the Council gave Larson a merit increase on the very night and in the very meeting wherein it promulgated the policy, which means it could not have followed the required steps in the policy for Larson; upon information and belief Larson did not receive a formal performance evaluation before receiving his increase; Kullman, on the other hand, received a formal performance evaluation from Larson, and he rated her poorly, recommending no increase), and it has conspired to and engaged in a pattern of intimidating and illegal conduct (including but not limited to conduct noted above) in an attempt to force her resignation from employment.

**COUNT I**

**VIOLATION OF 42 U.S.C. §1983, 1985**
**(Both Plaintiffs against City, Olson, Larson and Scheidt (unless noted))**

29. Plaintiffs reallege the above allegations as if hereinafter set forth in full and further states and alleges as follows:

30. This claim arises under Title 42 of the United States Code (Civil Rights Act of 1964, as amended), including but not limited to §1983 and §1985.

31. Defendants, the City alone or jointly in conspiracy with Olson and/or Larson (in their official and/or individual capacities), deprived Plaintiffs of their rights, privileges, and immunities secured by the United States Constitution, and specifically the First and Fourteenth Amendments to the United States Constitution, including but not limited to the following clearly established rights:

a. to free speech and expression/against retaliation;

b. to due process;

c. against selective enforcement (Kullman); and

d. to freedom of association and access to courts (Kullman)

And defendants obstructed justice, and intimidated witnesses, and prevented officers from discharging duties.

32. At all times pertinent, defendants Olson Larson and Scheidt were employees/agents/elected/appointed officials of City and individuals. In doing the acts and things set forth in this Complaint, defendants were each acting alone or together in a conspiracy and under color of law of a statute, ordinance, regulation, custom, or usage when they deprived Plaintiffs of their Constitutional rights, privileges, and immunities.

33. Before the occurrence described above in this Complaint, the City developed, maintained, or tolerated policies or customs that caused the deprivation of Plaintiffs' Constitutional rights. Defendants conspired with these policies or customs, and with those actions or inactions set forth in the following paragraphs of this Count.

34. The individuals and the City, as a matter of policy and practice, has with deliberate indifference failed to adequately discipline, train, or otherwise direct its employees or officials concerning the constitutional rights of citizens and employees, thereby causing the unlawful conduct described above, and thereby harming Plaintiffs.

35. As a direct and proximate result of the noted defendants' conduct, inaction, policy or customs as noted above, Plaintiffs suffered the deprivation of their Constitutional and/or federal statutory rights and suffered personal injuries, including loss of income, humiliation, mental anguish and suffering, and emotional distress.

36. By reason of the foregoing, Plaintiffs are entitled to judgment against Defendants in a reasonable amount in excess of $50,000, and her reasonable attorney fees and costs incurred

herein.

**COUNT II**
**(Whistleblower Violation)**
**(Kullmand and Johnson against City)**

37. Plaintiffs reallege the above allegations as if hereinafter set forth in full and further states and alleges as follows:

38. Plaintiffs reported a violation or suspected violation of state law to a member of the City Council. Thereafter, Johnson was terminated and Kullman was constructively terminated or a conspiracy/plan was attempted to terminate/not appoint Kullman (which only became ineffective because then-Mayor Rutske lost the election and his appointment power, and the new Mayor appointed her), or otherwise discriminated against Plaintiffs or penalized them regarding their compensation, terms, conditions, location or privileges of employment because of their report.

39. Defendant City violated Minn. Stat. §181.932. 40. As a dircct and proximate result of City's wrongful actions against them, Plaintiffshave sustained mental and emotional injuries, in addition to their wage loss and economic injuries.

41. By reason of the foregoing, Plaintiffs are entitled to judgment against Defendant City in a reasonable amount in excess of $50,000.

**COUNT III**
**(Tortious Interference with Contract)**
**(Johnson against Olson and Larson)**

42. Plaintiff Johnson realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

43. Defendants Olson and Larson tortiously interfered with Johnson's employment agreement with the City, by wrongfully inducing the City Council to terminate Johnson and/or eliminate her position.

44. Defendants Olson and Larson acted intentionally and with improper motive.

45. By reason of the foregoing, Plaintiff Johnson has suffered damages, including but not limited to loss of income and other harm in excess of $50,000.

46. By reason of the foregoing, Plaintiff Johnson is entitled to judgment against Defendants Olson and Larson in an amount in excess of $50,000.

**COUNT IV**
**(Violation of Minnesota Chapter 13)**
**(Kullman against City)**

47. Plaintiff Kullman realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

48. Defendant City obtained private and confidential information relating to Kullman from her, without first giving her a Tennessen Warning, and disseminated/disclosed that information and used that information against her in its refusal to grant her a merit increase, to discipline her for First Amendment expression and freedom of association, her right of access to court/counsel, and in attempting to force her out of employment/constructively discharging her, in violation of Minnesota Chapter 13.

49. By reason of the foregoing, Plaintiff Kullman has suffered damages, including but not limited to loss of income and other harm in excess of $50,000.

46. By reason of the foregoing, Plaintiff Kullman is entitled to judgment against Defendant City in an amount in excess of $50,000.

**WHEREFORE**, Plaintiffs request judgment against Defendants, and each of them, as follows:

1. Judgment in a reasonable amount in excess of $50,000, and including but not

limited to compensatory, presumed and punitive damages.

2. Interest on the aforesaid amounts.

3. Awarding to Plaintiffs their reasonable attorney fees and costs and disbursements incurred herein.

4. Issuing a permanent prohibitory injunction prohibiting Defendants, their officers, agents, employees, and successors, from engaging in the illegal practices complained of herein; and

5. Reinstating Plaintiff Johnson to her former position, and to the extent Kullman's position has been diminished or impacted by the illegal conduct of Defendants, restoring her position, and such other relief as the Court deems just and equitable.

Plaintiffs hereby demand a trial by jury on all applicable Counts.

Dated: July 3, 2001

**ATTORNEYS FOR PLAINTIFFS**
**JILL CLARK, P.A.**

By: Jill Clark, Esq. (#196988)
2005 Aquila Avenue North
Minneapolis, MN 55427
(763) 417-9102

# Please forward this announcement to the recipient of this fax.

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

**For additional information on either program please visit our website at www.mnd.uscourts.gov.**

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500